IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BNSF RAILWAY COMPANY,                §
                                     §
        Plaintiff,                   §
                                     §
VS.                                  §   NO. 4:07-CV-017-A
                                     §
BROTHERHOOD OF MAINTENANCE OF        §
WAY EMPLOYEES,                       §
                                     §
        Defendant.                   §

## MEMORANDUM OPINION
and
ORDER

For the reasons expressed below, the court has concluded that the motion for summary judgment filed by plaintiff, BNSF Railway Company, ("BNSF") should be granted, that the counter-motion for summary judgment filed by defendant, Brotherhood of Maintenance of Way Employees Division/IBT, ("Brotherhood") should be denied, and that Award Nos. 36983 (pertaining to claimant R. D. Pakarinen ("Pakarinen")) and 36984 (pertaining to claimants G. G. Skogen ("Skogen") and P. D. Anderson ("Anderson")[1]) of the National Railroad Adjustment Board, Third Division, ("Board") should be vacated.

I.

## Proceedings Before, and Rulings of, the Board

Award Nos. 36983 and 36984 resulted from claims made by BNSF employees that BNSF violated Article XV of a 1996 collective bargaining agreement between BNSF and its employees, represented

---

[1] There was a third claimant, B. A. Graves ("Graves"), involved in the proceeding that resulted in Award No. 36984, but the Board dismissed his claim by reason of a settlement agreement he entered into with BNSF. Brotherhood's App. at 17.

by Brotherhood ("Agreement").[2] Article XV provides protection to the employees when BNSF subcontracts out specified kinds of work without affording furloughed employees a certain level of protection. In pertinent part, Article XV provides as follows:

> The amount of subcontracting on a carrier, measured by the ratio of adjusted engineering department purchased services (such services reduced by costs not related to contracting) to the total engineering department budget for the five-year period 1992-1996, will not be increased without employee protective consequences. In the event that subcontracting increases beyond that level, any employee covered by this Agreement who is furloughed as a direct result of such increased subcontracting shall be provided New York Dock level protection for a dismissed employee, subject to the responsibilities associated with such protection.

Brotherhood App. at 2.

Brotherhood maintained in the claims before the Board that resulted in Award Nos. 36983 and 36984 that there was an increase in subcontracting beyond the 1992-1996 level, and that the claimants, who were covered by the agreement, were, in each case, furloughed as a direct result of the increased subcontracting and that, therefore, they were entitled to the protection contemplated by Article XV. BNSF took the position in each of the proceedings before the Board that there had not been such an increase and that, in any event, none of the claimants was

---

[2] Article XV is part of a 1996 national agreement, sometimes referred to by the parties as the 1996 Agreement, sometimes as the 1996 National Agreement, and sometimes as the 1996 National BMWE Agreement. It is in the record under tab 5 of BNSF's Appendix. For the purposes of this litigation, the Agreement is the functional equivalent of a collective bargaining agreement between BNSF and its employees, represented by Brotherhood. For a description of the circumstances surrounding the formulation of Article XV of the Agreement, the court makes reference to the statement of A. Kenneth Gradia at tab 4 of BNSF's Appendix.

furloughed as a direct result of increased subcontracting as contemplated by Article XV.

BNSF provided Brotherhood and the Board the information upon which BNSF based its position that there had not been a subcontracting increase beyond the 1992-1996 level. Brotherhood demanded access to the data underlying the information provided by BNSF. BNSF declined to furnish the underlying data, pointing out that if it were to provide the requested data it would be making a disclosure of confidential information detrimental to its business interests.

On May 12, 2004, the Board ordered in both proceedings "an award favorable to the Claimant(s)," Brotherhood App. at 15, 18, in the form of a "remand[] to the parties to take action consistent with the terms of [the] Award[s]." Id. at 14, 16-18.[3] The Board's reasoning that led to the awards included the following:[4]

> The above shows that for the ratios required by Article XV, <u>the Carrier supplied the Organization with summary information on an annual basis taken from the R-1 Reports</u>; refused to supply any documentation supporting those summaries, refused to supply information relative to the ratios computed on a monthly basis; and <u>took the position that the Organization had not met its burden of proof</u> that the ratios specified in Article XV were exceeded because the Organization ". . . utterly failed to provide supporting evidence." The Carrier cannot provide summaries, refuse to provide the Organization with

---

[3]The Board gave detailed reasons in Award No. 36983 for its decision to remand, Brotherhood App. at 1-15, and, in effect, adopted those reasons in its decision in Award No. 36984, id. at 16-18.

[4]Generally, the Board refers to BNSF as the "Carrier" and the Brotherhood as the "Organization."

3

access to the underlying documentation which formed those summaries, and then argue that the Organization failed to provide "supporting evidence" that the ratios were exceeded. The Organization cannot provide that "supporting evidence" because <u>the carrier</u> is in possession of the "supporting evidence" and <u>the Carrier</u> refused to allow the Organization to see that "supporting evidence."

> . . . .
>
> . . . Although we have the discretion to do so, because <u>we believe that the Carrier acted in good faith</u> and because we are advised that this is the first dispute under this language to reach this level, we shall not presently sustain the claim on its merits because the Carrier did not provide the requested information. <u>We have no reason to doubt the accuracy of the summary information provided</u>. However, because the basis for the information has been challenged and the Carrier has not disclosed the underlying information used to formulate the summaries, we have nothing before us which supports the accuracy of that summary information. But, where the Carrier takes the position that the Organization has not provided "supporting evidence" for its claim as it did in this case and that "supporting evidence" is totally within the Carrier's control and may well dispose of the entire dispute, <u>basic concepts of fairness require that the Organization be allowed to examine that source information</u>. We shall, therefore, require the Carrier to make available to the Organization the source documentation used to prepare the summaries relied upon by the Carrier. <u>Should the Carrier fail to make that source information available, we will sustain the claim.</u>

<u>Id.</u> at 10, 12-13 (further emphasis added).

The Board defined the nature and scope of the awards as follows:

> <u>We decide no other issues aside from those discussed concerning the providing of information.</u> Specifically, we express no opinion on whether the Claimant was ". . . furloughed as a direct result of such increased subcontracting. . . ." Indeed, if there was no "increased subcontracting" as contemplated by Article XV, because this claim seeks protective benefits for the Claimant, then the question of whether the Claimant is entitled to those benefits is moot. <u>Nor do we</u>

4

> express an opinion on whether the ratios provided by the carrier are accurate. Similarly, we do not express an opinion on whether the subcontracting was justified because the Carrier's equipment was inadequate. We have only decided that because the Carrier relied upon its records as a defense to the claim, refused to allow the Organization to see the source documents for its summaries that it relied upon and then took the position that the Organization had not provided supporting evidence to substantiate the claim, that the Carrier is now obligated to allow the Organization to inspect the source documents used by the Carrier in formulating the summaries that the Carrier used in defending this claim.

Id. at 14 (further emphasis added).

The Board recognized that problems may arise concerning the method of disclosure of the information it obligated BNSF to disclose, the identities of those entitled to see the information, protection for BNSF's business records, and the like. Id. at 14. Those questions were left by the Board to be resolved by the parties in the first instance. Id. The Board said it retained jurisdiction over disputes, if any, which may arise as a result of the Board's decision, id.; and, it concluded by noting that "[t]his is no small, simple discovery dispute," and emphasizing the nationwide importance of disclosure of information the Board concluded BNSF must disclose in order to avoid the risk of having the claims against it granted by reason of nondisclosure. Id.

The carrier members of the Board[5] dissented. Id. at 19. Points made in the dissent that are pertinent to this court's ruling include the following:

> By ignoring the fact that the Organization did not offer any evidence to support even a prima facie case, let alone satisfy the two-pronged test under Article XV, the Board improperly placed the burden of proof in this case, and thereby prejudiced the Carrier's rights. Moreover, because it is undisputed that the Organization never produced evidence on the threshold "direct result" issue, the Board was simply outside its authority in issuing a discovery order that the Carrier must open its books to provide the Organization with an opportunity to try to discredit the only evidence either side had offered before the record closed.
>
> In defending its extraordinary discovery order, the board asserted that it has "broad discretion" as to the "actions we can require the parties to take. . . ." We strongly disagree. In fact, there exists no such discretionary power; rather, the Board's jurisdiction is limited to its mandate under the RLA and to the Agreement involved in the dispute--neither of which provides any such discovery right as imposed by the board here.

Id. at 19-20.

Following unsuccessful correspondence and communications between BNSF and the Brotherhood concerning the proper interpretation and application of the May 12, 2004, awards, BNSF submitted to the Board on June 23, 2004, a request for interpretation of the awards. BNSF App. at tabs 13, 14. On June 23, 2005, the Board issued its "Interpretation No. 1 to Award Nos. 36983 & 36984" in response to BNSF's request. Brotherhood

---

[5] The Board consisted of members selected by the labor organizations, an equal number of members selected by the carriers, and a referee. See 45 U.S.C. § 153 First (h), Third division, and (l).

App. at 30. The Board rejected the request, explaining, <u>inter alia</u>, that:

> The Carrier therefore seeks an advisory opinion from the Board - ". . . BNSF seeks a ruling as to whether these Awards directing discovery/document production <u>would</u> be satisfied <u>if</u> . . . [and] BNSF respectfully requests an interpretation/clarification of these Awards and specifically requests that the Board state that <u>if</u> the information stated above is provided, such production <u>will</u> satisfy the requirements of the above-referenced awards." (Emphasis added.) The Board does not give advisory opinions based on hypothetical situations.
>
> . . . .
>
> The Board has no intention to give advisory opinions based on hypothetical situations or in any way to micromanage the disclosure of information in this case. . . . The obligation is on the Carrier to produce the required information. The obligation is on the parties - and not the Board - to set up procedures for the production of that information and to agree upon further procedures for the production of that information and to agree upon further procedures to protect the confidentiality of the Carrier's records. The parties are also free through the negotiation process to come up with something completely different that will resolve these particular disputes or contracting disputes in general. Should that not be accomplished, then these disputes can be returned to the Board. The Board will then decide whether the requirements specified in Third Division Award 36983 have been met and, if they are not met, whether to sustain the claims. <u>If we are of the opinion that the Carrier met its obligations, we will then address the merits of the underlying claims. The Board will not, however, give an advisory opinion that if the Carrier takes certain action then it will be in compliance with the requirements specified in Third Division Award 36983</u>.

<u>Id.</u> at 34-35 (emphasis added).

BNSF made another request of the Board for interpretation of the awards, BNSF App. at tab 16, framing the issue to be decided as follows:

7

> The Carrier offered its records relevant to the Board's
> Awards 36983 and 36984, subject to the requirement that
> the Organization sign a confidentiality agreement
> against disclosure of those proprietary documents. But
> the Organization refused to sign the agreement. Should
> the Board now dismiss these claims for the
> Organization's failure to cooperate with the discovery
> process by the Board?

Id. at 2.

The Board's response to BNSF's second submission for interpretation was to issue a ruling on December 7, 2006, sustaining the claims and directing, as a remedy, that "the Claimants shall be made whole in accord with the provisions of Article XV." Brotherhood App. at 36, 41. After discussing the efforts of BNSF and Board to reach an agreement concerning confidentiality of BNSF's records and as to the method of disclosure of the records, the Board gave the following explanation for its ruling that the claimants be made whole:

> Given the Carrier's original position in this dispute
> that the claims should be denied because the
> Organization did not provide the supporting evidence
> for the claims and then refused the Organization's
> requests for access to that information, which was
> solely in control of the Carrier, it is now appropriate
> to draw the negative inference that had the Carrier
> produced the information sought by the Organization,
> that information would have supported the
> Organization's position. . . . Again, in Award 36983
> we clearly held that "[s]hould the Carrier fail to make
> that source information available, we will sustain the
> claim." The Carrier has not done so. The claim will
> therefore now be sustained.

Brotherhood App. at 40-41.

On December 7, 2006, the carrier members issued a strong dissent from the majority's June 23, 2005, and December 27, 2006, rulings, id. at 42-47, noting that the awards initially

8

constituted a discovery order; that the Board, having ordered the discovery, refused to cooperate with BNSF in the latter's attempt to define acceptable discovery consistent with BNSF's need to protect the confidentiality of its records; and, finally, that the Board seriously departed from its authority in making the awards.

II.

## The Contentions of the Parties

A.   BNSF's Contentions.

This action was initiated by BNSF's complaint filed January 5, 2007, asking the court to vacate Award Nos. 36983 and 36984. BNSF alleged that the awards are improper because:

>    (1)   Pursuant to 45 U.S.C. § 153 First (i), the Board's jurisdiction is limited to the resolution of disputes over the interpretation and application of agreements, with the result that it lacked jurisdiction to create new substantive agreement provisions.  The information and document production requirements of the awards imposed new substantive obligations on BNSF under Article XV, with the result that the awards should be vacated under the authority of 45 U.S.C. § 153 First (q).

>    (2)   By ordering the parties to bargain over the scope and substance of the newly created discovery obligation under Article XV, but then refusing to decide the dispute when the parties were unable to agree, the Board exceeded its jurisdiction and/or failed to comply with the

requirements of the Railway Labor Act ("RLA"), with the result that the awards should be vacated pursuant to § 153 First (q).

(3) Under the RLA, there is no obligation on the part of rail carriers to produce documentation or to otherwise engage in discovery in connection with disputes subject to arbitration. Therefore, by ordering BNSF to engage in extra-contractual discovery, the Board failed to comply with the requirements of the RLA, including the requirement to decide the claim presented based on the on-property record, as contemplated by § 153 First (i).

(4) The Board's awards violate public policy, and the Due Process Clause of the Fifth Amendment to the United States Constitution, because they require public disclosure of confidential and proprietary financial data without the benefit of a protective order, which may subject BNSF to fines and penalties imposed by other governmental agencies, with the result that the awards should be vacated on public policy or due process grounds, or both.

BNSF filed its motion for summary judgment on July 6, 2007, asking that the court render a summary adjudication pursuant to

§ 153 First (q) vacating the awards for the following reasons:

> 4.  These awards exceeded the Board's jurisdiction in several respects.  First, the Board failed to apply the express terms of Article XV.  In Particular, the Board ignored the second prong of the Article XV test - the requirement that the union show that any furlough was a "direct result" of increased subcontracting.  It was so fixated on the threshold issue of data disclosure that it apparently forgot that there is more to the Agreement.
>
> 5.  Second, the Board exceeded its jurisdiction by creating new substantive terms that are not in the parties' Agreement.  In particular, the Board created a brand new obligation to produce "source documents" supporting the calculation of the carrier's subcontracting ratios. including the carrier's confidential data.  Even if the Board could rationally infer a production obligation in the terms of Article XV (despite the lack of any such language), there is no basis in the contract for suggesting that the carriers would have agreed to disclosure of confidential information without any protections at all.
>
> 6.  Third, the Board exceeded its jurisdiction by basing its ruling on data production on its own sense of "industrial justice."  Indeed, the Board expressly stated that it was trying to resolve a broad problem concerning disputes over subcontracting in the rail industry, and that the railroad's purported obligation to produce data is grounded in the Board's own sense of "basic fairness," rather than the parties' Agreement.
>
> 7.  Fourth, the Board exceeded its jurisdiction when it refused to comply with its statutory obligation under § 3 First (m) of the RLA to resolve the parties' dispute over the terms and conditions of the new data production obligation it had created, and instead simply held against the railroad when the parties were unable to reach agreement.

BNSF's Mot. at 2-3.

B.  <u>Brotherhood's Contentions</u>.

On March 12, 2007, Brotherhood filed its answer to the complaint and a counter-petition for enforcement of the arbitration award.  For the most part, Brotherhood admitted the

11

accuracy of facts alleged in BNSF's complaint.  Many of BNSF's conclusory allegations were denied, and Brotherhood answered that BNSF was not entitled to any of the relief it seeks in this action.

By the counter-petition, Brotherhood asked the court to enforce the Board's awards in accordance with 45 U.S.C. § 153 First (p) by ordering BNSF to comply with the awards.  On July 6, 2007, Brotherhood filed its motion for summary judgment, seeking a summary adjudication enforcing the awards against BNSF.  The grounds of Brotherhood's motion are as follows:

> Under RLA Section 3 First (p) and (q), when any employee or any carrier, is aggrieved by an award and seeks review, or when a carrier does not comply with an award and enforcement is sought, "the findings and order of the division of the Adjustment Board shall be conclusive on the parties" except that the order may be set aside "for failure of the division to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order."
>
> The Supreme Court stated that "[o]nly upon one or more of [the statutory] bases may a court set aside an order of the Adjustment Board. . . .  The dispositive question is whether the party's objections to the Adjustment Board's decision fall within any of the three limited categories of review provided for in the Railway Labor Act."; and that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision".  The Fifth Circuit stated that "The Railway Labor Act allows only limited judicial review of arbitration decisions and its range is 'among the narrowest known to the law'"; and that "[u]nless we find the Board's interpretation to be 'wholly baseless and completely without reason', its decision must stand"; and that an award will be vacated where it is "so unfounded in reason and fact, so unconnected with the wording and purpose of the

12

> collective bargaining agreement as to "manifest an infidelity to the obligation of the arbitrator'". The Fifth Circuit has also inferred a fourth basis for review of RLA awards: "whether an award was rendered in violation of a party's due process rights". The Fifth Circuit has noted that some courts have recognized a fifth, public policy, ground for vacation of arbitration awards, but the Court has not recognized such a basis for review of RLA awards.

Brotherhood Mot. at 3-4.

\* \* \* \* \* \*

The court understands that the parties agree that the court should dispose of this case by a ruling on the motions for summary judgment and that there are no fact issues to be resolved by a fact finder.

III.

Analysis

This controversy is governed by the Railway Labor Act, 45 U.S.C. §§ 151-188. The claims reached the Board for rulings pursuant to the authority of 45 U.S.C. § 153 First (i). Enforcement of the awards is governed by § 153 First (p), which authorizes the bringing of an action in a district court to enforce an order of the Board, and authorizes the court to make such order and enter such judgment as may be appropriate to enforce or set aside the order of the Board, with the proviso that "such order may not be set aside except for failure of the [Board] to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction, or for fraud or corruption by a member of the [Board]." 45 U.S.C. § 153 First (p). BNSF's

action to set aside the awards is governed by 45 U.S.C. § 153 First (q). The judicial authority, and limitations of authority, in an action brought under § 153 First (q) parallel the authority and limitations prescribed by § 153 First (p).

As the language of the statute suggests, board awards are reviewable by a district court on narrow grounds. Continental v. Int'l Bhd. of Teamsters, 391 F.3d 613, 617 (5th Cir. 2004). "Normally, an award is deemed to be within the Board's jurisdiction when it is grounded in the [collective bargaining agreement]." Id. "Unless a court concludes that the Board's interpretation of the contract is 'wholly baseless and completely without reason,' the Board's interpretation must stand." Id. However, an award of the Board "settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notion of industrial justice." Id. (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987)).

This court has been directed by the Fifth Circuit not to uphold a Board's decision "when it dispenses its own brand of industrial justice outside the scope of an arbitration agreement." American Eagle Airlines v. Airline Pilots Ass'n, 343 F.3d 401, 405 (5th Cir. 2003) (quotation marks omitted). The Fifth Circuit has ruled that the court is "free to scrutinize an arbitrator's award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the

14

collective bargaining agreement." Id. (quotation marks omitted). "Where an arbitrator exceeds his contractual authority, vacation or modification of the award is an appropriate remedy." Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'g, 889 F.2d 599, 602 (5th Cir. 1989).

The Board awards in question obviously are not what the RLA contemplates. The awards are not in conformity with the jurisdictional prerequisites of the Agreement. The Board chose not to decide the issues legitimately presented to it by the claimants but, instead, to go off on a procedural tangent by directing BNSF to provide undefined discovery for the benefit of Brotherhood and by punishing BNSF by awards on the merits in favor of the claimants simply because BNSF failed to comply with the improperly imposed undefined discovery obligation. The court cannot glean from the writings of the Board that they genuinely were interpreting or applying the Agreement. If one were to treat what the Board did as an interpretation or application of the Agreement, their discovery mandate certainly did not draw its essence from the Agreement. The Board's directive to BNSF that it must comply with an undefined discovery directive at risk of a ruling against it on the merits of the claims simply reflected the Board's "own notions of industrial justice. Continental, 391 F.3d at 617. "[T]he Board exceeded the scope of its jurisdiction in fashioning its award." Id. at 620.

Brotherhood maintains that all the Board did was to apply in deciding the merits of the claims an accepted evidentiary rule

15

that a factual inference can be drawn against a person who declines to produce evidentiary material over which it has sole control. To urge that nothing more than that occurred in the Board's awards is absurd. The claimants had the burden to establish the facts that would entitle them to awards on the merits of their claims. In a defensive posture, BNSF provided information affirmatively establishing the lack of factual merit of the claims. Under those circumstances, there certainly would be no logical or legal basis for any inference that the information provided by BNSF was fabricated or inaccurate. The Board found that BNSF acted in good faith, and the Board said that it had "no reason to doubt the accuracy of the summary information [BNSF] provided." Brother App. at 12. If the parties to the Agreement wished to obligate BNSF to provide certain kinds of information, or more detailed information, they could have so provided in their collective bargaining agreement. Their failure to so provide does not authorize the Board to add terms to the Agreement. That is a matter the law contemplates will be resolved by negotiations between the parties, not by a directive of the Board based on its notion of industrial justice, or, to use the words of the Board, its perception of "basic concepts of fairness." Brotherhood App. at 13.

Brotherhood places significant reliance in support of the Board's awards on the opinion of the Fourth Circuit in Norfolk & Western Ry. Co. v. Transp. Commc'ns Int'l Union, 17 F.3d 696 (4th Cir. 1994). In Norfolk & Western, the Fourth Circuit declined to

16

vacate a Board award that was based on an adverse inference the Board drew from the failure of the carrier to comply with the Board's request of the carrier to submit additional evidence supplemental to the evidence the carrier had relied on in support of its position. The request by the Board was made pursuant to a provision of the collective bargaining agreement that expressly conferred upon the Board the power to make such a request. Id. at 700. Specifically, the collective bargaining agreement provided in pertinent part that:

> 7. . . . The Board shall have authority to *request* the production of additional evidence from any party, except in [circumstances not relevant to Norfolk & Western].
>
> . . . .
>
> 9. Each party is charged with the duty and responsibility of including in its written submissions all known relevant facts and documents as evidence.

Id. at 700 n.3.

Neither BNSF nor Brotherhood has called to the attention of the court any agreement between BNSF and Brotherhood that is remotely similar to the agreement involved in Norfolk & Western that was so essential to the Fourth Circuit's decision. The Fourth Circuit concluded that the action of the Board was within the Board's jurisdiction because of the special provision in the contract. Id. at 700-01. A distinction expressed in Norfolk & Western provides one of the reasons why that decision is not persuasive here. The Fourth Circuit explained that the Board did not

> undertake to draw an adverse inference from a refusal
> to produce requested evidence where it had not been
> explicitly granted the authority to request evidence
> beyond that submitted on the property. It merely
> assumed an evidentiary power that could reasonably be
> understood as implicit in the powers expressly
> conferred upon it by the parties. . . .

Id. at 701. Because Norfolk & Western is so clearly distinguishable from the instant action for the reasons stated above, the court is not devoting attention to other factual distinctions that appear to exist between the two cases.

Having concluded that in making the awards as it did the Board exceeded its jurisdiction, the court is not required to resolve (a) BNSF's pleaded theory that the awards violate public policy and the Due Process Clause, or both, or (b) the ground of BNSF's motion that the Board exceeded its jurisdiction when it refused to grant BNSF's request for an interpretation of the Board's initial awards. However, the court does note its puzzlement over the Board's refusal to honor BNSF's request for an interpretation of the May 12, 2004, awards. Section 153 First (m) directs that "[i]n case a dispute arises involving an interpretation of the award, the division of the board upon request of either party shall interpret the award in the light of the dispute." If the court were to assume, arguendo, that the May 12, 2004, awards were within the Board's jurisdiction, the conclusion that would follow is that the Board failed to perform its statutory obligation to BNSF when it declined to honor BNSF's request for an interpretation of the awards in the light of the discovery dispute between BNSF and Brotherhood. Of course, the

broader answer is that the Board had no power to provide an interpretation of its discovery directive because it had no jurisdiction to make the directive in the first place.

Nor does the court consider that there is a need to address BNSF's contention that the Board exceeded its jurisdiction by ignoring the second prong of the Article XV test, i.e., the requirement that Brotherhood show that any furlough was a "direct result" of increased subcontracting, other than to note that the Board obviously did sidestep that potentially dispositive issue and that there does not appear to be any justification for it having done so.

The court has considered the possibility of remanding the claims to the Board for further consideration. However, recognizing that the claimants, through the Brotherhood, have had a full and adequate opportunity to present their case to the Board, and apparently have not presented to the Board any evidence that would allow the Board to rule that their claims have merit, the court considers such a remand to be inappropriate. It is not enough for the Board to say that it is authorized to rule against BNSF simply because of a notion that the information BNSF provided in opposition to the claims was not sufficiently detailed.

IV.

ORDER

For the reasons given above,

The court ORDERS that the motion for summary judgment of BNSF be, and is hereby, granted, and that the motion for summary judgment of Brotherhood be, and is hereby, denied.

The court further ORDERS that all relief sought by Brotherhood by its counter-petition be, and is hereby, denied, and that all claims of Brotherhood for affirmative relief be, and are hereby, dismissed.

The court further ORDERS that Award Nos. 36983 and 36984 be, and are hereby, vacated.

SIGNED November 16, 2007.

    /s/ John McBryde
JOHN McBRYDE
United States District Judge